Mark L. Eisenhut, Bar No. 185039
  meisenhut@calljensen.com
Samuel G. Brooks, Bar No. 272107
  sbrooks@calljensen.com
Joshua G. Simon, Bar No. 264174
  jsimon@calljensen.com
CALL & JENSEN
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel:   (949) 717-3000
Fax:   (949) 717-3100

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ÖSSUR hf, ÖSSUR AMERICAS, INC.<br><br>Plaintiff,<br><br>vs.<br><br>MANAMED, INC., SPARTAMED, LLC, JOHN LASSO, JOSEPH HORTON and TREVOR THERIOT,<br><br>Defendants. | Case No.  8:17-cv-01015<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   July 24, 2017<br>Time:  1:30 p.m.<br>Place: Courtroom 10C<br><br>Complaint Filed:   6/12/2017<br>Trial Date:            None Set |

CALL & JENSEN

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ......................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 2

   A.   Össur and its "Unloader" trademarks .............................................. 2

   B.   Össur's Unloader One Brace ............................................................ 3

   C.   Defendants' infringing conduct ....................................................... 4

   D.   Defendants' Offloader One Brace .................................................... 6

III. LEGAL STANDARD .................................................................................... 7

IV.  ARGUMENT ................................................................................................. 7

   A.   Össur is likely to prevail on the merits of its trademark
      claims ................................................................................................ 7

       1.   Össur's "Unloader" marks are strong ................................... 8

       2.   Defendants' "Offloader One" knee brace competes
           directly with Össur's "Unloader One" and other
           "Unloader" line of knee braces ........................................... 10

       3.   The marks are nearly identical in appearance, sound,
           and meaning ........................................................................ 11

       4.   Further investigation and discovery will likely reveal
           evidence of actual confusion ............................................... 11

       5.   Defendants intended to cause confusion and trade on
           Össur's goodwill ................................................................ 12

       6.   The parties' marketing channels overlap entirely ............... 14

       7.   Consumers are not likely to exercise great care ................ 15

       8.   To the extent product line expansion is relevant, it
           favors a finding of likely confusion ................................... 18

   B.   Össur is likely to suffer irreparable harm if an injunction
      does not issue .................................................................................. 19

   C.   The balance of equities favors granting an injunction ................... 21

   D.   An injunction is in the public interest ............................................ 22

- ii -
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION

**TABLE OF CONTENTS(con't)**

Page

V.    CONCLUSION...................................................................................23

# TABLE OF AUTHORITIES

Page

FEDERAL CASES

*Alliance for the Wild Rockies v. Cottrell*,

632 F.3d 1127 (9th Cir.2011)..........................................................................7

*AMF Inc. v. Sleekcraft Boats*,

599 F.2d 341 (9th Cir. 1979)................................................................12, 14, 18

*Amoco Production Co. v. Village of Gambell, Alaska*,

480 U.S. 531 (1987).......................................................................................21

*Application of Hollywood Brands, Inc.*,

214 F.2d 139 (C.C.P.A. 1954) ..........................................................................9

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*,

156 F. Supp. 3d 1173 (E.D. Cal. 2016)............................................................19

*Color Me House, Inc. v. Discovery Commc'ns, Inc.*,

No. C12-5935 RJB, 2013 WL 1283806 (W.D. Wash. Mar. 27, 2013) ....................22

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*,

618 F.3d 1025 (9th Cir. 2010)...........................................................................9

*GoTo.com, Inc. v. Walt Disney Co.*,

202 F.3d 1199 (9th Cir. 2000).........................................................................8

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*,

559 F.3d 985 (9th Cir. 2009)...........................................................................22

*Nat'l Wildlife Fed'n v. Coston*,

773 F.2d 1513 (9th Cir.1985).......................................................................7, 8

*Opticians Ass'n of America v. Independent Opticians of America*,

920 F.2d 187 (3d Cir. 1990)...........................................................................19

*Republic of the Philippines v. Marcos*,

862 F.2d 1355 (9th Cir.1988)..........................................................................7

CALL&
JENSEN

1

**TABLE OF AUTHORITIES (con't)**

2

Page

3

*Shell Offshore, Inc. v. Greenpeace, Inc.*,

4

709 F.3d 1281 (9th Cir.2013)........................................................7

5

*Triad Sys. Corp. v. Southeastern Express Co.*,

6

64 F.3d 1330 (9th Cir. 1995)......................................................22

7

*Wells Fargo & Co. v. ABD Ins. & Financial Services, Inc.*,

8

758 F.3d 1069 (9th Cir. 2014)....................................................12

9

*Winter v. Natural Res. Def. Council, Inc.*,

10

555 U.S. 7 (2008) .................................................................7, 21

11

OTHER AUTHORITIES

12

2 McCarthy on Trademarks and Unfair Competition § 11:83......................8, 9

13

4 McCarthy on Trademarks and Unfair Competition § 23:12........................12

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      INTRODUCTION

Defendants are blatantly and intentionally infringing Plaintiffs' well known trademarks in order to peddle their cheap—and potentially dangerous—imitation of Plaintiffs' flagship product. This conduct must be stopped. If Defendants are not restrained promptly, their infringement will cause confusion among members of the public and irreparable harm to Plaintiffs.

Össur, hf (Össur) and its United States subsidiary, Plaintiff Össur Americas, Inc. ("Össur Americas") are leading providers of orthopedic braces, including braces designed for treating osteoarthritis (often referred to as "OA") in the knee. Össur has manufactured and sold knee braces under its "Unloader" trademarks for nearly thirty years. The trademark for Össur's current flagship OA knee brace, the Unloader One, has been in use for over a decade.

Defendants are willfully infringing Plaintiffs' "Unloader One" trademark by selling a competing OA knee brace confusingly named the "Offloader One." The striking similarity of Defendants' mark to Plaintiffs' well-known trademark undoubtedly demonstrates Defendants' knowing and willful disregard of Plaintiffs' trademark rights. However, lest there be any doubt, Defendants' bad intent is further proven by their past unlawful and unfair competition with Plaintiffs. While working as the President of one of Plaintiffs' United States distributors, Defendant John Lasso conspired with one of the distributor's former sales representatives, Trevor Theriot, and another experienced industry player, Joseph Horton, to found Manamed, Inc., a business that competes directly with Plaintiffs. Subsequently, Lasso and Theriot also formed Spartamed LLC, another competing company. Defendants began diverting business away from Plaintiffs while they were still supposedly working for Plaintiffs' distributor. Defendants' sale of the "Offloader One" is a continuation of their unlawful and unfair assault on Plaintiffs' business.

Defendants' use of the "Offloader One" trademark is a transparent attempt to cause confusion in the market, and to unfairly benefit from the goodwill and reputation

Plaintiffs have built around the Unloader One. The Unloader One is built to exacting standards, makes use of Össur's portfolio of valuable patents, and is supported by numerous clinical studies substantiating its efficacy. Defendants' "Offloader One," on the other hand, is poorly made and poorly designed. Indeed, if any patients or practitioners were to attempt to use Defendants' Offloader One in the same way as the Unloader One, the patient could suffer further knee damage and increased pain rather than an alleviation of symptoms.

As explained fully below Defendants' conduct is likely to cause confusion and irreparable harm. A preliminary injunction will serve the public interest by preventing confusion. Finally, while a preliminary injunction will cause no damage to Defendants, the potential damage to Plaintiffs is great if an injunction does not issue. On balance, the equities strongly favor entry of an injunction restraining Plaintiffs from using the "Offloader One" trademark while this action is pending.

## II.   STATEMENT OF FACTS

### A.   Össur and its "Unloader" trademarks

Össur is a leading developer, manufacturer, and distributor of orthopedic durable medical equipment. [Declaration of Otto Fernandez ("Fernandez Dec.") ¶ 3]. This equipment includes prosthetics and orthopedic devices, such as knee braces. [Fernandez Dec. ¶ 3]. Össur offers a line of knee braces designed for the treatment of osteoarthritis ("OA") using variations of the trademark "Unloader," including the "Unloader One," "Unloader One Custom," "Unloader FIT," "Unloader Custom," "Unloader One Plus," and "Unloader Spirit." [Fernandez Dec. ¶ 3]. More recently, Össur extended its "Unloader" line to include a brace for treating hip OA. [Fernandez Dec. ¶ 3].

Össur's predecessor, Generation II Orthotics, Inc., ("Generation II") first began using the trademark, "The Unloader," in commerce in or around 1990. [Fernandez Dec. ¶ 4]. That mark was registered on the Principal Register in 1992 (assigned Registration Number 1,690,007), and renewed in 2002. [Request for Judicial Notice ("RJN") ¶¶ 1-2]. Generation II also registered a variation of this mark, "Unloader Express," which

CALL&
JENSEN

1   remains in force. [RJN ¶¶ 5-7].

2         Össur received an assignment of several of Generation II's trademarks, including

3   "The Unloader" and "Unloader Express" in 2008, and continued to use the "Unloader"

4   marks without interruption. [RJN ¶¶ 3, 6]. In December 2006, Össur began using in

5   commerce a new variation of the "Unloader" marks, namely "Unloader One."

6   [Fernandez Dec. ¶ 5]. This mark was registered on the Principal Register in 2009

7   (assigned Registration Number 3,632,596), and became incontestable in 2015. [RJN ¶¶

8   8-9]. Össur obtained a separate registration for "Unloader" in 2011 (assigned

9   Registration Number 3,929,856), and that trademark is also now incontestable. [RJN ¶¶

10   10-11].

11         Össur's "Unloader" and "Unloader One" were both registered again in 2015

12   (Registration Numbers 4,745,122 and 4,745,123, respectively). [RJN ¶ 12]. These

13   registrations expanded Össur's rights in the Unloader marks to orthopedic braces other

14   than knee braces in recognition of Össur's expansion of its "Unloader" product line. In

15   light of its other registrations, Össur permitted the '007 registration to lapse, and that

16   registration was cancelled May 28, 2015. [Fernandez Dec. ¶ 5, RJN ¶ 4]. Össur

17   currently owns five live registered marks containing the term "Unloader." [RJN ¶ 13].

18   **B.    Össur's Unloader One Brace**

19         Osteoarthritis is a degenerative joint disease involving the wearing down of

20   flexible tissue (cartilage) at the ends of bones, with symptoms including joint pain,

21   stiffness, crackles, swelling, tenderness, joint deformity, and limping. [Declaration of

22   Duane Romo ("Romo Dec.") ¶ 3]. Osteoarthritis pain is often treated medically with

23   pain relievers, and severe osteoarthritis may require surgery. [Romo Dec. ¶ 4].

24   However, this pain can also be treated with certain bracing technology. [Romo Dec. ¶

25   4].

26         All of the braces in Össur's "Unloader" line are designed for use by patients

27   suffering from unicompartmental osteoarthritis using Össur's dynamic force strap

28   system. [Romo Dec. ¶ 5]. The Unloader One has been clinically shown to relieve pain,

CALL &
JENSEN

increase function, and reduce the need for pain relievers. [Romo Dec. ¶¶ 5-6, Hoover Dec. ¶ 13]. The Unloader One is endorsed by professional golfer, William McGirt, and is advertised both on the internet and in various trade publications. [Hoover Dec. ¶¶ 3-10]. The Unloader One features several patented technologies. [Fernandez Dec. ¶ 6]. It is also notable for its comfortable and lightweight design. [Romo Dec. ¶ 6]. The Unloader One has a very low profile, but still provides excellent suspension and pain relief. [Romo Dec. ¶ 6]. It is the gold standard of arthritis braces.

### C.    Defendants' infringing conduct

Össur hf operates in the United States through its subsidiary, Össur Americas, Inc. ("Össur Americas"). [Fernandez Dec. ¶ 2]. Össur Americas, in turn, owns Team Makena, LLC ("Team Makena"), which is an authorized distributor of Össur products, including Unloader knee braces. [Fernandez Dec. ¶ 7]. Until his termination in November 2016, Defendant John Lasso was the President of Team Makena. [Fernandez Dec. ¶ 8]. Lasso was also a part owner of Team Makena until May 19, 2017, when Össur Americas completed the purchase of his ownership interest. [Fernandez Dec. ¶ 8].

In the months leading up to his termination, Lasso took several steps to undermine Team Makena's business in contravention of his fiduciary duties. [Fernandez Dec. ¶ 9]. In particular, Lasso founded a competing company called Manamed with a long-time Team Makena sales representative, Trevor Theriot, and another industry player, Joseph Horton. [Fernandez Dec. ¶ 9]. Theriot and Lasso also founded Defendant Spartamed. [Fernandez Dec. ¶ 9]. Together, Lasso and Theriot began systematically siphoning Team Makena's business to these competing companies before and after Lasso's termination as President of Team Makena. [Fernandez Dec. ¶ 9].

In connection with his termination, Lasso misappropriated Team Makena's trade secrets and committed various other misdeeds to the damage of Team Makena and Össur Americas. [Fernandez Dec. ¶ 10]. Team Makena and Össur Americas are currently engaged in litigation with Defendants Lasso and Manamed in California

Superior Court to recover the damage caused by Lasso's misconduct. [Fernandez Dec. ¶ 11]. On February 28, 2017, the Superior Court issued a preliminary injunction prohibiting Lasso and Manamed and those acting in concert with them from soliciting Team Makena's employees, independent sales representatives, and customers. [RJN ¶ 14].

Lasso, Theriot and Horton have long been familiar with Össur's products and trademarks, including its "Unloader" line of knee braces. [Fernandez Dec. ¶ 12]. In spite of their knowledge—and without Össur's consent—Manamed launched a directly competing knee brace[1] called the "Offloader One." [Fernandez Dec. ¶¶ 12-14]. Spartamed will likely act as a distributor of the "Offloader One." [Fernandez Dec. ¶ 12].

The trademark "Offloader One" is confusingly similar to Össur's "Unloader One" trademark. When used in reference to treatment of osteoarthritis pain, the words "unload" and "offload" are essentially interchangeable. [Fernandez Dec. ¶ 18]. However, Defendants' "Offloader One" knee brace is far from interchangeable with Össur's "Unloader One" brace. Össur's product is technologically advanced, and represents the state of the art in durable medical equipment designed to alleviate osteoarthritis knee pain. [See Romo Dec. ¶¶ 5-7; Fernandez Dec. ¶ 6]. With proper fit and professional adjustment, Össur's "Unloader One" brace is extremely effective. [Romo Dec. ¶ 6]. Defendants' "Offloader One" brace, on the other hand, is a clumsy, low quality one-size-fits-all design, that may actually aggravate rather than alleviate patients' symptoms. [Romo Dec. ¶¶ 7-13].

Plaintiffs recently discovered Defendants' knock product, and after an investigation promptly brought a complaint. [Fernandez Dec. ¶ 12]. During the course of the investigation, Össur discovered that Defendants had not only selected a name that was confusingly similar to Össur's trademark, but that they also capitalized on the confusion resulting from this similarity. In particular, when Össur's investigator called

---

[1] Described as "a universal unloader brace that allows for a varus or valgus unloading in one brace. Indicated for patients with knee arthritis." [Fernandez Dec. ¶ 13].

1   Manamed and requested an "Unloader One" knee brace (the name of Össur's product),

2   Joseph Horton, made no effort to correct the confusion, but instead sold Manamed's

3   inferior "Offloader One" as if it was the "Unloader One." [Declaration of Tom Dailey

4   ("Dailey Dec.") ¶¶ 5-11].

5   **D.      Defendants' Offloader One Brace**

6   Manamed's "Offloader One" brace falls far short of the Unloader One in both

7   quality and performance. First, the function of Manamed's brace is the polar opposite of

8   the Unloader One. Rather than using a dynamic strapping system such as Össur's

9   patented technology to gently pull the affected joint toward the hinge, [see Romo Dec. ¶

10   5], Manamed's brace appears to have been designed to push the joint away from the

11   hinge for patients suffering from medial knee pain. [Romo Dec. ¶¶ 9-10]. It is unclear

12   how the brace functions for relieving lateral knee pain. [Romo Dec. ¶ 10]. But in any

13   event, if a patient or practitioner mistakenly believed that Manamed's brace works the

14   same as the Unloader One, he or she could end up increasing pressure on the affected

15   knee joint compartment rather than relieving it, thereby aggravating joint pain and

16   leading to further loss of function. [Romo Dec. ¶ 9].

17   Furthermore, an initial analysis of Manamed's brace raises serious questions as to

18   whether it can work effectively as designed. In order for a knee brace to reduce

19   pressures in the knee joint it must provide effective counterforce. [Romo Dec. ¶ 13].

20   The Unloader One provides this counterforce through its dynamic strapping system.

21   [Romo Dec. ¶ 13]. Manamed's brace, on the other hand, uses a static strapping system

22   which likely cannot provide the forces needed, at least without causing serious

23   discomfort. [Romo Dec. ¶ 13].

24   Finally, the quality of Manamed's brace is very low. The sample inspected by

25   Össur exhibited a large amount of "play" in the hinge, and while it was sold as new the

26   brace had obvious signs of wear and tear. [Romo Dec. ¶ 14, Hoover Dec. ¶ 14]. The

27   brace also featured sharp points and edges, and extraneous materials likely to cause

28   irritation to the wearer. [Hoover Dec. ¶ 17]. Overall, Össur anticipates that purchasers

1   of Manamed's brace will experience a relatively low degree of satisfaction.

2       Because of the great risk that consumers will mistakenly associate Össur with

3   Defendants' infringing products (and Defendant's intentional perpetuation of such

4   confusion), Össur promptly filed the complaint on June 12, 2017. Össur now seeks a

5   preliminary injunction to restrain Defendants' improper conduct, and to prevent further

6   irreparable harm to Össur.

7   ## III.   LEGAL STANDARD

8       A preliminary injunction must be granted when the party seeking relief shows

9   "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable

10  harm in the absence of preliminary relief, [3] that the balance of equities tips in his

11  favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def.*

12  *Council, Inc.*, 555 U.S. 7, 20 (2008). If the balance of equities tips "sharply" in the

13  plaintiff's favor, then a court may issue a preliminary injunction upon a showing that

14  there are "serious questions going to the merits—a lesser showing than likelihood of

15  success on the merits." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291

16  (9th Cir.2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

17  (9th Cir.2011)). "Serious questions need not promise a certainty of success, nor even

18  present a probability of success, but must involve a 'fair chance of success on the

19  merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988)

20  (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985)).

21  ## IV.   ARGUMENT

22      ### A.   Össur is likely to prevail on the merits of its trademark claims

23      In order to prevail on its claims for trademark infringement, Össur must show

24  that it owns a valid trademark, and that Defendants used a similar trademark in a

25  manner that is likely to cause confusion among ordinary consumers as to the source,

26  sponsorship, affiliation, or approval of their goods. Ninth Circuit Manual of Model

27  Civil Jury Instructions 15.6. The first element, ownership of a valid trademark, can be

28  proved by demonstrating that the mark is registered. *Id.* Instr. 15.8 ("One way for the

plaintiff to prove trademark validity is to show that the trademark is registered."). Whether a likelihood of confusion exists is determined by applying the multi-factor *Sleekcraft* test. *See id.* Instr. 15.18. The non-exclusive factors to consider include:

1. The strength of Össur's trademark;
2. Whether Össur's and Defendants' goods are similar, related, or complementary;
3. The similarity of the marks;
4. Whether there is any actual confusion;
5. Defendants' intent;
6. Overlap in marketing and advertising channels;
7. Consumers' degree of care; and
8. The likelihood that either or both parties will expand their product line to compete directly.

With respect to the first element, the "Unloader" trademark has been in use since 1990, and Össur currently owns five registered trademarks which make use of that mark. [Fernandez Dec. ¶ 4, RJN ¶¶ 1-13]. Össur's "Unloader One" trademark has been in use for over a decade, and its registration is incontestable. [Fernandez Dec. ¶ 5,RJN ¶¶ 8-9]. There is no question that Össur owns valid trademarks.

Applying the *Sleekcraft* test, there is also no question that Össur will establish that confusion is likely. Every relevant factor weighs in favor of finding likelihood of confusion.

### 1.     Össur's "Unloader" marks are strong

Confusion is more likely when the plaintiff owns a "strong" trademark. A trademark is strong if it has either "conceptual strength" or "commercial strength." "Conceptual strength" refers to the "inherent potential of the term at the time of its first use" to distinguish the user's goods or services. 2 McCarthy on Trademarks and Unfair Competition § 11:83 (4th ed.); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). When a mark is arbitrary, fanciful, or unexpected as applied to the goods in question, that mark has a high degree of inherent distinctiveness, and is therefore considered conceptually strong. For example, the word "Blackberry" is a conceptually strong trademark as applied to electronics. Marks that suggest some characteristic or quality of the goods or services, but which still require the consumer to

make some use of the imagination to connect the mark to the goods, are considered inherently distinctive. However, conceptually they are relatively weaker than arbitrary or fanciful marks. Marks which directly describe the characteristics or qualities of the goods or services and require no imagination are conceptually weak, and cannot be protected without a showing that the mark has acquired distinctiveness.

Here, "unloader" as applied to knee braces is inherently distinctive as a suggestive mark. It suggests a quality of the product (i.e., it "unloads" stress in the relevant body parts), but the consumer cannot automatically conclude that the product is a knee brace without the use of some imagination. The Patent & Trademark Office clearly considered the "Unloader" marks to be conceptually strong, as it approved the registrations without requiring a showing of secondary meaning. Marks that are descriptive cannot be registered without such a showing. *See Application of Hollywood Brands, Inc.*, 214 F.2d 139, 140 (C.C.P.A. 1954) ("There is no doubt that Congress intended that the burden of proof should rest upon the applicant for registration" to prove that mark has become distinctive). Össur's marks, therefore, are at least relatively strong conceptually.

More importantly, Össur's Unloader marks, and the Unloader One mark in particular, enjoy a very high degree of commercial strength. "Commercial strength" refers to the degree of recognition that a trademark enjoys in the relevant market. *See* 2 McCarthy on Trademarks and Unfair Competition § 11:83 (4th ed.). Commercial strength can be shown by evidence of longstanding exclusive use, significant sales, and advertising. *Id.*; *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1034-35 (9th Cir. 2010) (considering advertising expenditures, volume of sales, and scope of advertising as evidence of commercial strength). In this case, Össur has offered its Unloader line of knee braces without interruption for nearly 30 years, and both Unloader and Unloader One have become incontestable. [Fernandez Dec. ¶¶ 4-5, RJN ¶¶ 9, 11]. The brand is so well known that Össur used the "Unloader" mark on its recent expansion into products for treatment of

hip osteoarthritis. [Fernandez Dec. ¶ 3]. Of the nine osteoarthritis knee brace models[2] offered by Össur, six are sold using variations of the "Unloader" mark. [Fernandez Dec. ¶ 3]. Össur advertises its "Unloader" line of knee braces in traditional media, at trade shows and industry events, online and in social media. [Hoover Dec. ¶¶ 3-10]. These advertisements focus largely on the "Unloader One." [Hoover Dec. ¶¶ 3-10]. The "Unloader One" is even endorsed by a professional athlete, golfer William McGirt. [Hoover Dec. ¶ 3].

In short, the name "Unloader" is synonymous with Össur. The "Unloader" marks as a whole, and the "Unloader One" in particular, enjoy an extremely high level of commercial strength. Therefore, this factor weighs heavily in favor of a finding that confusion is likely.

### 2. Defendants' "Offloader One" knee brace competes directly with Össur's "Unloader One" and other "Unloader" line of knee braces

The second factor in the *Sleekcraft* test asks whether the products in question are closely related. The more related the products are, the higher the likelihood that consumers will be confused by similar trademarks. Here, Defendants' "Offloader One" knee brace purports to serve the exact same purpose as Össur's Unloader One—to alleviate osteoarthritis pain. [See Fernandez Dec. ¶ 13 (Manamed brace described as "a universal unloader brace that allows for a varus or valgus unloading in one brace. Indicated for patients with knee arthritis.")]. In other words, Össur's and Defendants' products do not just compete in the same general field of knee braces, they compete directly in the specific market niche of osteoarthritis solutions. There can be no dispute that this factor weighs in favor of finding a likelihood of confusion.

---

[2] Össur's full offering of OA knee braces is available at https://www.ossur.com/oa-solutions/oa-products/oa-knee. Össur also offers a variety of knee brace solutions designed for use in treating injuries. *See* https://www.ossur.com/injury-solutions/products/knee.

CALL & JENSEN

### 3. The marks are nearly identical in appearance, sound, and meaning

The third *Sleekcraft* factor relates to the degree of similarity between the marks in question. The more similar the marks are in appearance, sound, and/or meaning, the higher the likelihood of confusion. Defendants' "Offloader One" mark is almost identical to Össur's "Unloader One" trademark in every respect. With respect to appearance, the marks differ by only three letters. Defendants' use the prefix, "off-," whereas Össur uses the prefix, "un-." Audibly, the marks are very similar. Three of the four syllables are identical in sound. There is also no difference in meaning between the terms "Offloader" and "Unloader." Indeed, according to www.thesaurus.com, the term "off-load" is listed as a synonym of "unload." *See* http://www.thesaurus.com/browse/unload. Similarly, a search for the term "offload" includes a list of synonyms for the meaning, "*as in* **unload**." *See* http://www.thesaurus.com/browse/offload?s=t. Doctors sometimes even use the terms "offload" and "unload" interchangeably. [Fernandez Dec. ¶ 18]. Given the high degree of similarity in appearance, sound, and meaning, this factor clearly favors a finding that confusion is likely.

### 4. Further investigation and discovery will likely reveal evidence of actual confusion

Össur only recently discovered that Defendants are using an infringing trademark to piggyback on its good will. Therefore, at this point in time  Össur has not yet gathered evidence that customers have actually experienced confusion as to whether Manamed's brace is affiliated with or sponsored by Össur. However, the evidence does indicate that Manamed stands ready to capitalize on any such confusion as it arises. When Össur's investigator asked to purchase Manamed's "Unloader One" brace, Manamed's vice president, Joseph Horton, made no effort to correct the confusion. [Dailey Dec. ¶ 5]. Instead, he gladly agreed to sell the Unloader, and then deceptively delivered Manamed's "Offloader One" brace. [Dailey Dec. ¶¶ 5-11, Exh. 1].

CALL & JENSEN

Moreover, evidence of actual confusion is not necessary to prevail on a claim for trademark infringement. Indeed, "at the preliminary injunction stage, evidence of actual confusion is of diminished importance." *Wells Fargo & Co. v. ABD Ins. & Financial Services, Inc.*, 758 F.3d 1069, 1072-73 (9th Cir. 2014); *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:12 (4th ed.) ("When the junior user's product or service is new on the market, there has been little opportunity for actual confusion and the absence of any such evidence is to be expected.").

### 5. Defendants intended to cause confusion and trade on Össur's goodwill

Defendants cannot seriously dispute that they adopted the confusingly similar "Offloader One" mark with knowledge of Össur's Unloader One mark. Nor can there be any real question that Defendants adopted that mark with the intent to cause confusion and trade on Össur's goodwill. As the Ninth Circuit has recognized, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).

Defendants were well aware of Össur's trademarks when they adopted the name "Offloader One" for their competing knee brace. Until recently, Lasso was the president and part-owner of Team Makena, one of Össur's United States distributors. [Fernandez Dec. ¶ 12]. Similarly, at the time they founded Manamed, Theriot was a Team Makena sales representative selling Össur products, including the Unloader line of knee braces. [Fernandez Dec. ¶ 9]. While they were at Team Makena, Lasso and Theriot were directly or indirectly involved in the sales of hundreds of units of "Unloader One" knee braces. [Fernandez Dec. ¶ 12].

Furthermore, the circumstances surrounding Lasso and Theriot's break from Team Makena are telling. Lasso and Theriot founded Manamed, and began diverting business away from Team Makena and toward Manamed **while Lasso was still president of Team Makena and Theriot was a sales representative at Team**

**Makena**. [Fernandez Dec. ¶ 9]. Lasso was terminated from Team Makena for cause due to his numerous breaches of fiduciary duties, contractual obligations and law, and Össur Americas exercised its right to purchase Lasso's interest in Team Makena. Notwithstanding his legal and contractual obligations, Lasso absconded with Team Makena's confidential information and company property. [Fernandez Dec. ¶ 10]. Lasso improperly used that confidential information to solicit both Team Makena's customers and employees in violation of his legal and contractual obligations. [Fernandez Dec. ¶ 10]. Lasso and Manamed are currently restrained from this conduct by a preliminary injunction in an action that is currently pending in California Superior Court. [RJN ¶ 14].

Defendants began manufacturing their "Offloader One" knee brace at least as early as August 2016, [Hoover Dec. ¶ 15], and they began selling the brace after Lasso and Manamed were already under orders from a California judge to refrain from acts of unfair competition. [RJN ¶ 14]. Defendants' decision to call their brace the "Offloader One" stands in stark contrast to Össur's other major competitors, each of which has their own line of osteoarthritis knee braces. For example, competing braces from DonJoy and Breg carry names such as the Nano, FullForce, OA Everyday, Solus, Fusion, Freestyle, and so forth. [Hoover Dec. ¶ 11]. Defendants clearly adopted the "Offloader One" trademark with intent to trade on the good name of the Unloader One, and to profit from the resulting confusion.

Furthermore, in the process of investigating Defendants' conduct with respect to their knee brace, Össur discovered that Defendants are actually selling their knee brace to customers who request the "Unloader One," without ever disclosing that Manamed's "Offloader One" is NOT the brace the customer requested. When Össur's investigator contacted Defendants and asked to purchase an "Unloader One" knee brace, Manamed's vice president, Joseph Horton made no effort whatsoever to correct the confusion between the "Unloader One" and the "Offloader One." [Dailey Dec. ¶¶ 5-11]. Rather, he eagerly exploited the confusion by selling Manamed's knock-off product as

CALL&
JENSEN

1  if it was the "Unloader One." Clearly, Defendants intend to capitalize on any confusion
2  between the products.

3  **6.    The parties' marketing channels overlap entirely**

4  "Convergent marketing channels increase the likelihood of confusion."
5  *Sleekcraft*, 599 F.3d at 353. Here, the marketing channels for Össur's and Manamed's
6  products overlap completely.

7  Consumers of knee braces designed for treatment of osteoarthritis ordinarily
8  purchase the brace on the recommendation or prescription of a doctor. Because it
9  requires training to fit an Unloader One brace to a particular patient, [See Romo Dec. ¶
10  5], Össur does not make the Unloader One available in retail stores. Rather, the
11  Unloader One is typically only purchased on a doctor's recommendation. [Fernandez
12  Dec. ¶ 15]

13  Similarly, Manamed's product description states that it is "[i]ndicated for patients
14  with knee arthritis," effectively implying that it will be prescribed by doctors to treat a
15  medical condition. [Fernandez Dec. ¶ 13]. Joseph Horton's conduct in selling the brace
16  confirms this implication, as he indicated to Össur's investigator that the cost of the
17  brace could be covered by medical insurance. [Dailey Dec. ¶ 7]. Thus, both Manamed
18  and Össur distributors sell products through these medical practitioners.

19  In addition to selling their products using the same sales methods, Össur
20  anticipates that Manamed will also make use of the same marketing channels. For
21  example, Össur attends several trade shows throughout the course of each year. [Hoover
22  Dec. ¶¶ 8-9]. These trade shows represent important opportunities to raise awareness of
23  Össur and its products among practitioners and patients, as well as to make sales.
24  [Hoover Dec. ¶ 9]. Össur promotes its Unloader One® knee brace at these events.
25  [Hoover Dec. ¶¶ 8-9, Exh. 1]. Össur's competitors generally attend these events as well.
26  [Hoover Dec. ¶ 9]. Össur anticipates that Defendants will attend these trade shows as
27  well, and offer their "Offloader One" brace. There is a high likelihood that Manamed's
28  attendance at these trade shows will create confusion as to whether their "Offloader

One" brace is sponsored by or affiliated with Össur.

### 7.   Consumers are not likely to exercise great care

One factor for the court to consider is the degree of care that can be expected from the purchasing class. The less careful the consumer is, the greater the likelihood of confusion.

In the case at hand, the opportunity for confusion or mistake is multiplied because it arises in at least three different stages of the chain of distribution: first at the prescribing physician level, next at the distributor level, and finally at the patient level, who is the ultimate consumer.

The process for a patient to obtain an OA knee brace is not as simple as making a purchase from the nearest Target store. Ordinarily, a patient suffering from knee osteoarthritis must visit a physician and obtain a prescription before purchasing such a brace. Many doctors will prescribe a specific brace by name or brand (such as Össur's Unloader One or DonJoy's OA Everyday) based on their assessment of the patient's needs. Some doctors, however, may simply write a prescription for the category of brace required, and leave it to the distributor to work with the patient on selecting the particular brace that best fits their goals.

After receiving a prescription, the patient must purchase the brace from a provider of durable medical equipment ("DME provider"). [Fernandez Dec. ¶ 17]. Generally, the patient's doctor will send the order directly to the DME provider, who then contacts the patient. [Fernandez Dec. ¶ 17]. The DME provider should ordinarily fill the order with the brace specified by the doctor. [Fernandez Dec. ¶ 17]. However, if the DME provider does not favor the prescribed brace, or if the order does not specify a particular brace, it may sell the patient a brace selected by the DME provider. [Fernandez Dec. ¶ 17]. If the patient is insured, the cost of the brace is ordinarily eligible for reimbursement. [Fernandez Dec. ¶ 17].

Because of this distribution system, opportunities for confusion (and deception) resulting from the similarity of trademarks arise at each stage of the process. First,

Össur (and its competitors) incur significant time and expense to educate doctors about their products. [Fernandez Dec. ¶ 18]. These efforts include in-person meetings and other direct communications. [Fernandez Dec. ¶ 18]. Doctors generally do not pay for the braces directly, do not fit patients with braces directly, and have busy practices. [Fernandez Dec. ¶ 18]. Therefore they have limited time and incentive to pay close attention to small differences in the trademarks from one brace to another. [Fernandez Dec. ¶ 18]. Many doctors rely heavily on their purchasing offices or managers to arrange for the braces they prescribe. [Fernandez Dec. ¶ 18]. Therefore, if Defendants or their sales representatives call on doctors in an effort to persuade them to start prescribing their "Offloader One," there is a good chance the doctors or their staff will experience confusion or mistake as to the connection between the "Offloader One" and Össur's Unloader One.

This risk is particularly acute in light of the fact that John Lasso and Trevor Theriot were affiliated with Össur for years before starting Manamed and Spartamed, and will likely call on doctors with whom they have already developed relationships.[3] Furthermore, if patients report dissatisfaction with or injuries due to an "Offloader One" brace, doctors are likely to assume the patient is referring to Össur's Unloader One.[4]

The opportunity for confusion and mistake is even more pronounced at the DME provider level. For example, a doctor who prescribes an "Unloader One" or simply an "Unloader" will expect the DME provider to fill the order with one of Össur's braces. However, the DME provider tasked with filling that order may confuse the "Unloader One" with Manamed's "Offloader One," and mistakenly fill the order with Manamed's product. There are thousands of DME providers in the United States, most of which are

---

[3] Because doctors are busy with their own practices, many will not have either the time or the subject matter expertise to fully appreciate the difference between the advanced technology offered by the Unloader One versus the questionable function of Manamed's "Offloader One." Rather than research these differences themselves, many doctors can be expected to make decisions based in large part on recommendations of sales representatives they have come to like and/or trust.

[4] This is especially likely if the doctor had prescribed an Unloader One, but the DME provider mistakenly supplied an "Offloader One."

small "mom and pop" establishments. [Fernandez Dec. ¶ 19]. Each DME provider may have hundreds of products, and their employees may have varying levels of familiarity with OA bracing. [Fernandez Dec. ¶ 19]. If the DME provider's employees do not take the time to take note of the differences between Össur's Unloader One and Defendants' Offloader One, they may very well confuse the two.

Furthermore, because insurance reimbursement rates are similar for all OA braces, the DME provider gets paid the same amount whether it sells an inexpensive item or a more expensive item. [Fernandez Dec. ¶ 20]. Thus, if Manamed's "Offloader One" is available to the DME provider for a lower wholesale price than the Unloader One (as is likely given the extremely low quality of the brace), it may purchase and supply the cheaper Manamed product rather than the prescribed Unloader One in order to make more money. In other words, the DME provider may opt for the "Offloader One" either because it does not recognize the difference in the products and thinks it is actually providing Össur's Unloader One to patients, or because it does not think the doctors and/or patients will realize that the product received is in fact different from the Unloader One. Either way, so long as Defendants' conduct is not enjoined, the chances are significant that DME providers will substitute the "Offloader One" in place of the Unloader One.

At the patient level, the risk of confusion is particularly high. Patients have the greatest incentive to get the right brace for their condition, but they will generally have the least amount of information. [Fernandez Dec. ¶ 21]. Rather than becoming experts on bracing technology themselves, most patients ordinarily simply rely on the recommendation of their doctor (or perhaps the DME provider), and they reasonably assume the brace they are provided is the exact same product their doctor prescribed. [Fernandez Dec. ¶ 21]. Because patients often have little responsibility for selecting the brace, they cannot be expected to pay close attention to the trademarks, or to pick up on slight differences such as between "Offloader One" and "Unloader One." Even patients who do specifically request the Unloader One may suffer confusion or mistake. For

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

example, a patient who received a recommendation from a friend to try the Unloader One may find it difficult to recall later whether the recommendation was for an "Unloader One" or an "Offloader One," and may purchase or even request the wrong brace by mistake.

Furthermore, while OA knee braces are not inexpensive, the cost will in many instances be covered by insurance or Medicare. [Fernandez Dec. ¶ 21]. Patients cannot be expected to exercise a high degree of care to distinguish products when they are not paying for the brace out of their own pockets. For these reasons, it is likely that patients who are prescribed Össur's Unloader One but mistakenly receive the "Offloader One" will not even realize that a mistake has been made.

Finally, patients who are dissatisfied with their "Offloader One" may wish to express their dissatisfaction with the brace in reviews, online forums, or other social media. Due to the ubiquitous online presence of Össur's Unloader One in OA knee bracing, patients who go online may easily confuse the shoddy "Offloader One" with Össur's Unloader One, and mistakenly vent their frustration against the Unloader One, much to the damage of Össur's reputation and its goodwill in the Unloader One.

In short, regardless of which level of the distribution chain is considered, consumers are not likely to exercise a high degree of care in distinguishing between trademarks. Therefore, this factor weighs in favor of a finding that confusion is likely.

### 8. To the extent product line expansion is relevant, it favors a finding of likely confusion

The last factor—likelihood of product line expansion—is ordinarily only relevant when the goods do not already compete directly. *See Sleekcraft*, 599 F.2d at 354 ("When goods are closely related, any expansion is likely to result in direct competition."). Because Manamed's "Offloader One" knee brace already competes directly with Össur's "Unloader" braces, this factor has little relevance. However, to the extent it is relevant this factor favors a finding of likely confusion.

As explained above, both Össur and Manamed currently sell their osteoarthritis

knee braces through physicians and distributors of durable medical equipment. At the present time, Össur does not offer its Unloader knee braces "off the shelf" in retail settings. [Fernandez Dec. ¶ 15]. However, it is possible that Össur, Manamed, or both may expand their product lines to include retail offerings. If Defendants eventually decide to expand into the retail space using the "Offloader One" trademark, the confusion that would follow would undoubtedly tarnish the reputation of Össur's higher quality Unloader knee braces. Similarly, Manamed's use of the "Offloader One" brace would prevent Össur from leveraging the goodwill it has developed in the Unloader trademark should Össur at any point enter the market for retail braces—particularly if Manamed's product is reviewed poorly.[5]

**B.**   **Össur is likely to suffer irreparable harm if an injunction does not issue**

Not only is there strong evidence that consumers are likely to suffer confusion if Defendants are not enjoined, there is also strong evidence that Össur is likely to suffer irreparable harm in the absence of an injunction. In the context of trademark infringement, irreparable harm may take the form of loss of control of a business's reputation. *See, e.g.*, *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1185 (E.D. Cal. 2016) (quoting *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990)). Loss of control of reputation "is an injury, even though the borrower does not tarnish it, or divert any sales by its use." *Id.* (quoting *Opticians Ass'n of America*, 920 F.2d at 195). "Potential damage to reputation constitutes irreparable injury for the purpose of granting [Plaintiff's request for] a preliminary injunction." *Id.*

To the extent consumers are likely to suffer confusion as to whether Defendants and their products are affiliated with or sponsored by Össur, Össur will suffer a corresponding loss to its control over its reputation. The likelihood that this irreparable

---

[5] Based on its analysis of Manamed's brace, Össur  expects the reviews of Manamed's product to be generally negative. [See Romo Dec. ¶¶ 8-15].

CALL &
JENSEN

harm will be realized is very high. Defendants have already begun marketing their knock-off brace. The damage to Össur's ability to control its reputation will increase with every trade show Defendants attend, and with every sales call Defendants' representatives make.

Indeed, Össur has discovered through its own investigation that Defendants have no qualms with passing off their "Offloader One" brace as the "Unloader One" when that brace is requested by name. [Dailey Dec. ¶¶ 5-11]. Without an injunction, there is simply no way to avoid the harm that Defendants will do to Össur, and the harm that Össur will suffer cannot be repaired simply by awarding money damages.

Furthermore, in addition to impeding Össur's ability to control its reputation, Defendants' conduct is likely to materially tarnish Össur's reputation. Össur's Unloader line represents the state of the art in osteoarthritis braces. [Romo Dec. ¶¶ 5-7]. The Unloader One is Össur's flagship product, and it is one of the most technologically advanced braces of its kind. [Romo Dec. ¶¶ 5-7]. In fact, the Unloader One makes use of several utility patents owned by Össur, including Össur's patented dual force strapping system. [Fernandez Dec. ¶ 6].

Defendants' knock-off product, on the other hand, may actually be dangerous— especially if a patient mistakenly believes that it uses the same technology as Össur's. Rather than placing the hinge on the affected side of the knee (like the Unloader One), the "Offloader One" places the hinge on the outside of the knee. [Romo Dec. ¶ 9]. Össur is not aware of any research that supports the conclusion that Manamed's "Offloader One" design is safe and effective for providing pain relief, but regardless of whether it can work, it definitely does not work the same way as the Unloader One. The instructions for use are sketchy at best, and they are potentially downright dangerous. The instructions do not explain how much lateral pressure should be applied to the knee, or even how to adjust the hinge's range of motion. [See Romo Dec ¶¶ 10-12]. When Defendant Horton sold the brace to Össur's investigator, he made no effort to fit the brace or explain how to do so. [See Dailey Dec. ¶¶ 7-10].

Furthermore, Manamed's strapping system does not appear sufficient to provide the counterforce necessary to actually provide pain relief. [Romo Dec. ¶ 13]. Finally, the quality of Manamed's "Offloader One" falls far below Össur's standards. [Romo Dec. ¶ 14; Hoover Dec. ¶¶ 14, 17-18].

Össur is extremely troubled by the possibility that consumers will purchase Defendants' product and associate it with Össur. Moreover, even if the consumer who purchased the product understands that it originated from Manamed (or Spartamed, if they purchase it through that company), that does not mean they will identify Manamed by name in their negative reviews, or in their complaints to doctors and friends. Indeed, it is likely that complaints intended for the "Offloader One" will mistakenly refer to the "Unloader One." Doctors, patients, and DME providers who see these negative reviews or hear these complaints will likely associate them with Össur, and Össur's reputation will take the hit. Perhaps most importantly, Össur is very concerned that patients who are suffering real arthritis pain will purchase Defendants' product and end up aggravating their symptoms rather than relieving them. The likely harm to Össur's reputation described above is exactly the type of harm that preliminary injunctions are intended to prevent.

### C.    The balance of equities favors granting an injunction

In deciding whether to grant a preliminary injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)). Here, the balance of equities favors granting the injunction.

As explained above, the harm to Össur if an injunction does not issue is great. In the absence of an injunction, consumers are likely to be confused as to whether Össur sponsors or is affiliated with Defendants and their products. Össur will lose its ability to control its reputation, and it is likely that Össur's reputation will in fact suffer because of the poor quality and design of Defendants' brace.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On the other hand, an injunction will not harm Defendants. They will not be prevented from conducting their business. Indeed, they may even continue to sell the knee brace in question so long as they choose a different trademark. Because Defendants launched the product only recently, they will not suffer any significant setback in terms of developing goodwill for the product. And to the extent they do have any goodwill associated with their "Offloader One" mark, they cannot complain that losing such goodwill constitutes harm when the evidence shows they adopted the mark with the intent to trade on Össur's reputation, and to capitalize on any confusion resulting from the similarity with Össur's well-known mark. *See Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (superseded by statute on other grounds) (Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities.").

**D.     An injunction is in the public interest**

One of the primary purposes for protecting trademarks is to prevent confusion in the marketplace. Therefore, an injunction that prevents confusion clearly serves the public interest. *See Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009) ("The wording of the district court's injunction reflects the usual public interest concern in trademark cases: avoiding confusion to consumers."); *Color Me House, Inc. v. Discovery Commc'ns, Inc.*, No. C12-5935 RJB, 2013 WL 1283806, at *10 (W.D. Wash. Mar. 27, 2013) ("The public interest in avoiding consumer confusion and in protecting trademarks favors [trademark owner seeking preliminary injunction] Color Me House.").

As explained above, Defendants' use of the "Offloader One" mark is confusingly similar to Össur's well-established Unloader marks, and may result in harm to Össur and patients. In light of the strong showing that confusion is likely, there can be no question that an injunction will serve the public interest by preventing further confusion.

**V.      CONCLUSION**

In conclusion, Defendants' conduct is likely to cause confusion and irreparable harm, a preliminary injunction will serve the public interest by preventing confusion, and on balance, and the equities strongly favor the entry of an injunction. Therefore, Plaintiffs respectfully request an injunction restraining Plaintiffs from using the "Offloader One" trademark while this action is pending.

Dated:  June 21, 2017                              By:  */s/ Samuel G. Brooks*
                                               Samuel G. Brooks